Appellate. Mr. Kramer for the appellant, Ms. Park for the appellate. Good morning, Your Honors, and may it please the Court. First, I apologize for my attire and appreciate the Court's consideration of my limited wardrobe at this point in my life. So, thank you. The government violated the Constitution, the Constitution of the United States, and they deleted the debriefing letter, in this case, not once, but twice. First, in the written sentencing submission to the District Court, which appears at page 63 of the appendix, which said, during the pendency of this case, the defendant admitted to previously buying one-quarter-kilogram quantities of cocaine and cooking that into crack cocaine. So, the defendant's not a low-level street dealer, but a person who engages in wholesale distribution. But it was really at the sentencing itself that the government, its allocution was about four pages, a little bit more than half a page. And then there was a question at the end by the District Court about the career offender, but the allocution itself was about a little less than four pages. Was the debriefing transcribed or otherwise recorded? I have not seen either a transcription or a recording of it. Then how do we know that the statement that the government made came from the debriefing as opposed to maybe a representation by its first counsel before the debriefing or the second counsel after the debriefing? Well, I would say two or maybe more ways. The primary way, of course, is that the government in its brief has conceded that it came from the debriefing. We have no obligation to accept a government concession. I understand no There's a Supreme Court law on that, particularly in a criminal case. No, I understand no obligation. Well, I think where a concession is a concession of fact like that, that that's the only place it could have come from. I think that it's But it's not. I just gave you a possibility. And actually, there's a third possibility. The first possibility is that there were representations made before the debriefing, and so it wasn't covered by that agreement. The second is there were representations made after the debriefing, so it wasn't covered. And the third is what occurred at the sentencing hearing where the attorney, the second attorney for the defendant, said that the prior offenses involved 60 grams, and we know that the current offenses involved about 110 grams. So that comes to about 170 grams, which is close to a quarter of a kilo. Well, I think the relevant conduct involves That representation by the attorney, by the way, the second defense attorney at trial, I can't find any support for that. For which part? I'm sorry. He said it was 60 grams. It was in the prior offenses. Right. I think that appeared in the pre-sentence report. I didn't see it. Maybe you'd be right. But that's not what he... I think his relevant conduct came out to that in the prior offense. But the... Let me... I don't want to monopolize this. I've already done that. But let me just finish this off with another question for you that I hope you'll address. If the debriefing was either transcribed or recorded, and nobody's seen what happened there, then how in heaven's name could the judge have known during the sentencing hearing that the information she was being told stemmed from an unrecorded debriefing? Oh, I don't think she had any idea about that. As a matter of fact... So we're not dealing... So she couldn't have been committing an error? No, no, no. Let alone plain error. No, relying on the information is the problem in reaching the sentence. You have to show a reasonable probability less than a preponderance that the sentence could have been different if this information had not been presented to her. If she... If the error had... Hadn't occurred. Yeah, I know. How could she have committed an error? And the second thing is... Now I'll shut up in a minute. Are you talking to me or...? No, no, no. I'm talking to myself. The second thing is that if it wasn't recorded and it wasn't transcribed, how would the second defense counsel know what went on? No, I think you're right on... So then how could that second defense counsel be ineffective? I think you're right on several different levels, but not on the ultimate result. I don't think the judge had any idea that this was... This material came from a debriefing that the government had promised not to use in any way against Mr. Kinggore. But... So it wasn't that the district court in a sense committed... The district court didn't commit the error. The government committed the error by not following through on its promise in the debriefing letter not to use this material, instead using it twice. I think it wouldn't be extremely unusual to record or transcribe a debriefing. They're usually just notes. The parties take notes. The defense lawyer is there. But I think, as I said, the government's concession that it could not have come from any other place, that it did come from the debriefing. And as a matter of fact, at the sentencing on page 18 of the transcript, the government says, we know by his own admission. That seems to me to be clear that it comes from the defendant himself and not from his lawyer at some other point. There is certainly nothing in the record that would indicate that it came from the lawyer. That would be even more unusual for the lawyer to make a statement like that either before or after the debriefing. And the government, as I said, has conceded that in this case, that it comes, that the material that was mentioned at sentencing and in the sentencing memo comes directly from the debriefing of the defendant. So nobody's raised that as an issue in the brief, so let me put it that way. And the use of the words, by his own admission, seems to me to make it clear that it could not have come from anywhere else. And so in the four pages of the chart— —is injected by government counsel, and nobody notices. Is that not reversible just because the district judge hasn't mastered the record fully enough to know that there's no basis for this? Well, a defense lawyer would have to object, I think. But there is—it could be cognizable on plain error because there is a reliability standard, too, that the district court has to rely upon. The evidence upon which the district court relies has to be reliable. So if the government says—the government could say something that's not in the record, but it would have to be supported by reliable evidence. They would have to give the basis for it. Whether the district court knows it's in the record or not, or what supports it, there has to be some reliability, and it would be up to the defense lawyer to object that there's no basis for that. It could also be cognizable on appeal as plain error, as this case is. So following up on Judge Randall's question, so when you're conceiving of the error, are you characterizing the error as the reliance on evidence that shouldn't have been relied upon because there was an agreement not to rely on it? I think that's the test, right. The error is the government breaching the plea agreement. And then I think it's not the error that the district court relied upon it, but how you determine if the outcome of the case would have been different. Do we usually conceive of errors as being something that the government does, or do we usually conceive of errors as being something that the district court does? And it may be that errors that, if it's the latter, I'm not sure that it is, but if it is the latter, it may be that the district court can be seen to have committed an error, and even a plain error, notwithstanding that it's perfectly understandable why the district court would have done that subjectively. It's not as if it should have been obvious to the court at the moment that an error was being committed, but it turns out that it is obvious that an error was committed. I mean, it may be just a matter of semantics. Let me put it that way. I'm not saying the district court, nobody told the district court, wait a minute, this is off limits, you shouldn't have heard. And so her error was, it's hard for me to say she made an error, but the error is, of course, the main error is the government's breaching the plea agreement. And then her reliance on it in issuing the sentence is not so, I don't know if you call that an error or just the fact that the remedy for the government's breach is that there was reliance upon the materials. I mean, there's one context in which we apply plain error, although the trial judge is completely innocent of anything, and that is when the law has changed, but we apply the law as it stands when we, actually when we rule, I guess, not when we hear the case, but the judge has no reason at all to anticipate the new law. So, I mean, it's a little odd to call it plain error by the judge, but we certainly do that in that context. And I think if you read the Puckett case, the Supreme Court decision, which says plain error applies, it was the same as in this case. There was a breach of the plea agreement. So it wasn't really that the district court did anything to use the wrong in a pejorative sense, but what they did was listen to the government's allocution and take that into account. And, well, in Pickett they said it didn't matter. I mean, one way to think about it is suppose the government had made the argument that it did, and then the district court says in rendering the sentence, I'm not going to rely on the particular evidence that the government referred me to because that doesn't seem like something I should rely on, and I'm going to go ahead and administer a sentence. I don't think there would be a question that there was an error, even though the government committed an error. It would have to have been something that the district court, in fact, did something with. So the error is the district court's, as Judge Williams said, it can still be an error even if it's entirely innocent, but the error comes from the district court's action. It's a little complicated by the fact that this is in the breach of the plea agreement because that's exactly what happened in Santabello. The government breached the plea agreement, the lawyer pointed it out, and the judge in Santabello said, I don't care what the government said, this guy's criminal record is so terrible I'm going to give him a year, I'm ignoring what the government said, and the Supreme Court reversed it. So it doesn't fit neatly into a category like that. I think the breach of a plea agreement is, in a sense, kind of a separate category of error. It's the error by the government in doing it and inducing maybe reliance upon the district court in acting upon it, I guess. It seems to me because that's exactly what happened in Santabello, and they sent it back. In Wolfe, in this court's case in Wolfe, the defendant, the government, said they would move for acceptance of responsibility, and they did not in light of the fact that the defendant lied about his name, lied about his criminal record, and lied about other names he had used. And they agreed on appeal that it had to be sent back. The only question before this court was, does plain error, or should it go to a different judge when it's remanded? And Judge Randolph, of course, said, I would send it back to a different judge in every case where there's a breach of the plea agreement. Well, I don't understand that. If we write an opinion agreeing with you, whichever judge gets the case back is going to know the same facts that Judge Collier knew during the sentence. I have to say that was my question. Well, I mean, that's not the way the courts view it. I mean, your dissent in Wolfe said we're balancing imponderables. In other words, by applying no real test at all, you said in Wolfe, and then it should automatically go to another judge. You disagreed with the majority. But the majority in Wolfe said we determine on a case-by-case basis. I don't see how you could send it back to the same judge in this case. Now, hopefully another judge— What is your answer to the question? Well, I think two things— The middle gymnastics appear to be substantially the same, whether it's Judge Collier or a new judge. I guess two things. First of all, the government won't say this at the resentencing. There will be a full resentencing, and the new judge will not hear this elocution. Judge will have read all about it. Well, that's the part you hope maybe they didn't. Once they see it's about a breach of a plea agreement, they might not read it. And I think there probably would be some discussion about that at a resentencing. So I don't mean my time to be—I think the other issues raised are equally important, including the substantive reasonableness of the sentence in light of the Sentencing Commission's new report saying that career offender sentences for drug offenders are totally out of proportion with career offender sentences. Is there any way that we would know whether—this defendant was represented by the public defender office originally? Yes. And also represented by the public defender during the debriefing? Yes. Okay. And then got new counsel. Yes. Retained counsel. And suppose that the public defender who was there at the debriefing never informed the new counsel what went on. That would not—well— Would that mean that the public defender was an ineffective assistance? I don't know of the duty. There's certainly an ethical duty to inform new counsel of— But we don't know when that was done. It's not in the record. In an ordinary situation, our file would be turned over to the new lawyer, which would, of course, include as one of the most prominent documents the debriefing letter. But that would be the—but there's nothing in this record specifically about— But not transcript or video of the debriefing? Again, not ever done that I can recall. There would have been notes of the debriefing in the file. But I don't ever recall a debriefing being videotaped or a court reporter there for a debriefing. Maybe in a— Is this like what we used to call queen for a day? Yes. Yes. Yes. Yes. But in any event, this—the breach of this plea agreement was quite severe. Let me put it that way. It went from the amounts in this case to quarter kilograms amounts, and the money amount was, I think, 20 times what the money amount. It went on—and as I said, it went on for more than half a page of the four-page allocution. Since you mentioned the debriefing letter agreement, it specifically says that Kastigar doesn't apply. Yes. And it also says that information that the defendant gave to the prosecutor could be used to develop sources. Yes. Right? But none were because it says quite specifically the defendant wasn't a retail-level narcotics trafficker. We know by his own admission that he had previously bought up to a quarter kilo of cocaine. Suppose the government did an investigation after the debriefing and found accomplices who said to the—and the government was looking to find a conspiracy and said to the government that, well, the defendant told us he bought up to a quarter of a kilo. Then, in that case, the prosecutor was perfectly within the agreement by mentioning it. You would have a much different case, clearly, but that's—  Well, the government has—all I can say again is the government has conceded and never provided. When it said to the district court he had access to amounts, he cooked the powder cocaine into crack cocaine, and then they gave the amounts of money that, once it's cooked, it can value up to $35,000, all of that was prefaced by them saying, we know by his own admission. There was no indication of any other source for this. Nor has the government challenged in its brief or given any indication in its brief that there was any other source other than— I take it the only entity or individual that would know what the source of the information would be, the prosecutor that made the statement. Yes, and there was nothing in the record, one way or the other, other than the government's brief conceding that it's a— So it would be the government that has the relevant knowledge. Yes. In other words— Well, that's what—I'm sorry. Absolutely. When I keep saying they've conceded it, they're the ones who know where the information came from. So when it was said both times by the same prosecutor and the same prosecutor who signed the debriefing letter, and the government says in its brief this is a breach of the plea agreement, I don't see where else it could have come from. A brief of the—a breach of the debriefing letter. Debriefing letter. I'm sorry. It also technically is incorporated into the plea agreement, and I don't think—again, the semantics on that, I don't think it matters which one you call it a breach of. It is clearly a breach. I would ask your Honest to send it back for resentencing before another judge. Thank you. Thank you. We'll hear from the government. May it please the Court, Anne Park on behalf of the United States. The government does concede that it breached the debriefing and plea agreements, but remand for resentencing is not required, we argue, because the appellant has failed to establish prejudice under the plain error standard. Judge Collard did not rely on the appellant's debriefing statement. She never explicitly mentioned them in her findings or— She echoes it. I'm sorry? She echoes the government counsel's statements. In terms of using the term wholesaler? Wholesale, and then the impression that there was never a day that he was out of prison, that he wasn't selling. But that information came mainly from his prior criminal history, the instant offense, and what the defendant said during the recorded conversation with the CI in this case. If you look at where the judge first uses the term wholesaler, you'll see that she's talking about it within the 3553A factor of seriousness of the instant offense. And she says the quantities in this case were large, and as a result I agree with the government's contention that the appellant was a wholesaler. And if you also look at the— In the recorded conversation, the defendant also said, I can get you more, didn't he? Yes, he said. In the recorded conversation with the CI in the instant offense where he sold the 60.6 grams of cocaine base, he indicated that he could set up larger drug deals and other drugs, including PCP. So it wasn't this information, the debriefing statements, that the court relied on. If you actually look— Well, how do we know? I mean, I think that it's possible. It's definitely possible that it wasn't relied on, but it seems to me it's at least— would you agree that it's at least possible that it was relied on? It is possible, but the standard— So then once you say it's possible, if I'm understanding the standard, it doesn't have to be more likely than not. Yes. Right? So then we're talking about something south of more likely than not and something north of inconceivable. And once we're talking about possible, how do we know that it's not possible enough, given the fact that the language wholesaler was repeated directly from the government's argument at the precise juncture that you acknowledge was grounded in the debriefing? Well, Your Honor, the standard is reasonable probability or reasonable likelihood. So it has to be reasonable. And all we can tell from the record is what the prosecutor said about the wholesale amounts and what the district court said. We have to look at what she actually gave as her reasons for her sentence. Now, the district court in this case, Judge Collier, it was not one of these sentences where she just said, I'm going to sentence you to 162. She gave a full-fledged explanation, went through each of the factors. So if you look at what the government does, and Mr. Kramer, if you look through at pages 15 to 19, is where, yeah, 15 to 19, the government begins her elocution by going through the sentencing transcript. January 30th, 2013. The government begins not with a debriefing statement. She begins, as the district court began with, his criminal history. And she says, look, when he was in jail, when he was not in jail, should be not, he has always been selling drugs. And this is what she uses to support that. He has two prior felony convictions. She emphasizes that he was, in his D.C. case, he was on release for one month. He was then picked up in his West Virginia federal case, and included in that case, he had 66 grams of crack cocaine in his vehicle. And then he says he goes to jail for seven to eight years on these two prior offenses. The ASA then says he comes right back out. Three months later, he sells 60 grams of crack cocaine to the confidential informant. And all this shows that when he was not in jail, he was selling. Then, if you look at page 17, she goes into his arrest. And not only do you have his instant offense. At the time of his arrest, 20 months later, he's found with additional drugs. And the PSR indicates 30.3 grams of cocaine hydrochloride, and then about 11.8 grams of crack cocaine. And then she moves on to the debriefing statement. She goes on to, she moves from, he's a repeated drug dealer. You can tell by his criminal history. Every time he's not in jail, he comes right out, he sells again. And this is on page 18, about line 7. She says the defendant wasn't a retail-level narcotics trafficker. Now, she says then she goes on, and this is a portion of the government's allocution that Mr. Kramer emphasizes. We know by his own admission that he had previously bought up to a quarter kilo of cocaine. And then she says at the end, about line 19, the defendant was a wholesaler. But she pivots right here from talking about the debrief statements. And she then says at lines 19 to 21, even the amount sold to the special employee here, the 60 grams, that's not a retail amount. Right, she does. But it seems to me, I mean, it's always hazardous to read a transcript as if it were a statute since it's occurring in real time. But even just looking at the precise language that was used, that critical passage on page 18 from line 7 to line 21, the defendant wasn't a retail-level narcotics trafficker. How do we know this? We know by his own admission, and then that's all about the quarter kilo that was raised in the debrief. And then the conclusion is the defendant was a wholesaler. And then the statement that you're highlighting, even the amount sold to the special employee here, the 60 grams, that's not a retail amount. So it's absolutely indisputably true, as you say, that you could reach the conclusion that he's more than a retail-level person based on the 60 grams alone, and that's the point the government was making. But the fact that the government makes it as an even-if statement, it's really, it seems like by the nature of the own argument, the load-bearing weight is placed on the quarter kilo. And then there's another statement. You could even call it an afterthought, but I don't want to artificially minimize it. But it's a statement that comes after that says, everything I've said is why he's obviously a wholesaler. Now, you could even reach that conclusion based on this offense alone. That's absolutely what it says, and it's definitely true that the court could have done that. But what we have to assess is whether there's a reasonable likelihood that the court relied on what the government itself characterized as bearing load-bearing weight, which is the quarter kilo. Yes, and, Your Honor, what I'm trying to say is that she didn't just rely on the debrief statement to support. There were two aspects of the argument, that he's a repeated drug dealer, and that all had to do with criminal history. It had nothing to do with the amounts of drugs he had. And, you know, both federal cases involved about 60 grams of crack cocaine. Then the second part of it is a wholesaler, that he was a wholesaler, not a retail-level drug dealer. And I want to emphasize that the reason why the government was making this argument was because in the defendant's sentencing memorandum, Mr. Benowitz actually argued that my client is a low-level drug dealer, and he sells drugs to support his own addiction or habit. So that's the picture he was trying to paint. The government came back in the sentencing memorandum. And the reason why it referenced the debrief statement was because she knew from the defendant's own mouth that he was definitely not a street-level dealer just trying to cover his addiction. Then why didn't you argue that the debriefing letter wasn't breach? Because if what you're saying now is that what he did was represented in the pre-sentence interview, represented something that he contradicted in the debriefing, then why isn't the ‑‑ why didn't you make that argument? We did not. We conceded, Your Honor, because if you look at the debriefing agreement, look at the letter of it, and technically it says if your client or a witness makes a statement at trial or any other proceeding that directly contradicts statements your client made in his debriefing, then the government can cross-examine. The ‑‑ The pre-sentence interview is not a proceeding? It wasn't the pre-sentence interview. I think ‑‑ I'm not sure where Mr. Benowitz ‑‑ Mr. Benowitz in the sentencing memorandum just said his client is a low-level drug dealer who is selling because he wants to ‑‑ Oh, it wasn't in the pre-sentence? No, it wasn't in the pre-sentence report. No. The pre-sentence report, the defendant just admitted to the statement of the offense and he said no more on advice of counsel. So what the government is just trying to say is the government ‑‑ the prosecutor was responding to the representations by counsel. It sounds like his defense counsel, the second defense counsel, didn't know what went on in the debriefing. It's not clear in the record, but he was trying to paint his client as a low-level drug dealer, and that's why the government came back to respond. How do you know that the quarter kilo business was mentioned in the debriefing? Your Honor, for two reasons. One is by negative inference. I looked through the entire trial file and all the transcripts. It was never on the record. And the prosecutor says his own admission. There were no such admissions that I could see on the record. And secondly, we had debriefing notes. It was not ‑‑ the debriefing was not recorded or transcribed, but there were notes. So ‑‑ And you looked at it? Yes. And, obviously, in a briefing, we've also talked to the prosecutor. But we are conceding that this information came from the debriefing, not from any other source. And to get back to Judge Sreenivasan's question about reasonable probability, you have to ‑‑ we're saying, look, it was a piece of the government's argument, but there was a whole other ‑‑ lots of other stuff that she talked about between pages 15 to 19. The debrief statement is only about, like, maybe more than half a page, but she goes on to say not only was the amount 60.6 grams consistent with being a wholesaler, but he also said in that recorded conversation, recorded drug deal, that he could get even more, bigger amounts. And then at the time of arrest, his arrest, he had more. What page is that of the second sentence? Page 18. I also want to point out ‑‑ Page 18 is the prosecutor's argument. Yes, that's what I'm ‑‑ I'm going through the prosecutor's argument. Is she referring to as the prosecutor? Yes, yes, the prosecutor. Yeah, I was looking. And so this is what she said about being a wholesaler. Now, if you look at what the court, when the court actually references the term wholesaler, I would direct the court to page 26. And this is, from my reading, the first instance where she brings up the term wholesale. The first thing under the statute the court considers, and this is at lines 11 through about 16, the seriousness of offense. And the offense itself here is pretty serious because the quantities are large, and as the government argues legitimately, Mr. King Gore was a wholesale trafficker, not just a retail trafficker in drugs. Then she's skipping to line 18. That means it's a serious offense and suggests a higher sentence. So her finding on wholesale is within the context of the seriousness of the instant offense. She does not make any mention of the debriefing statements. The second time she uses the term wholesaler. But I think the fact that it's discussing the seriousness of the offense isn't to the exclusion of reference to prior conduct. It's often the case under the law that the seriousness of the instant defense is informed by previous conduct, right? That's what three strikes laws are about. That's how the Supreme Court discusses three strikes laws, is that the instant offense is made more serious because the individual is a recidivist. Yes. And his prior convictions, all that the court knows about, which she went through in great detail, were his D.C. case and his federal West Virginia case, which also involved about 66 grams of crack cocaine. Right. And if you're drawing a distinction between convictions and unconvicted but admitted to conduct, it just seems to me that as a matter of theory, prior convictions inform the seriousness of this offense, then prior conduct as admitted to could equally inform the seriousness of this offense. So she could be referring to. . . I understand what the court is saying. So it's definitely a possibility. So you're saying within this discussion, she could have been in the back of her mind thinking about the admitted prior conduct. Right, particularly because she uses the word wholesale. She distinguishes retail from wholesale, and when the government counsel at argument distinguished retail from wholesale, what was between retail and wholesale is the discussion of the court. And in addition to other stuff, the instant offense, and stuff that the information that appellant is not contesting, all I can say is if it had been a consideration, the court would have said it. This was not a judge that was doing sentencing where she decided 162 months, it meets all the factors, I've considered the factors, and let's put an end to this. This judge took a lot of time to go through his criminal history to figure out that she wanted to sentence him to more than 7 to 8 years because that was not enough to deter him. And she was trying to figure out a range below the career offender guideline of 188. And she was very detailed in her findings, and it was not superficial sentencing. So all I can say to the court is, is it possible? Sure. Does the record show that there's a reasonable probability that this debriefing statement affected her sentence? No. Because we have to see what she actually did. And what she actually did was, at the very beginning, when she first starts talking to Mr. Fenner, What's a reasonable probability? A probability is usually expressed in percentages. Yes. A reasonable probability or a reasonable likelihood is the way the court characterizes it. There's no particular way. That doesn't change anything. No, no. I understand. It's a term that this court is familiar with using all the time. It's a reasonable word that tells you virtually nothing. Because it's totally circular. A reasonable probability is one that makes you not confident in the result. And you're not confident in the result because it's a reasonable probability that it was wrong, which tells you nothing. Your Honor, then I would, it's hard to say it tells you nothing because we spend a lot of our time oftentimes talking about reasonable probabilities, both in the Strickland context and it's a standard that's quite familiar in the area of the law. It is not concrete. It is not certainly a certainty. I wish there was a formula that we could plug in and we could get a reasonable probability. Of course, that wouldn't actually help that much because none of us could possibly know whether it reached 45 percent or 35 percent or 55 percent. Exactly. And so all I can do to the court is to say, if you look at this record and look what the court said and look what she emphasized in the sentence, her big emphasis, and this is what I was trying to say, is when she begins this, when she's talking to Mr. Benowitz at the beginning of the sentencing, she says appellant's, quote, criminal history, quote, is really the critical thing here. And then she goes on to review his critical history, and that's at page five of the sentencing transcript. And then if you go look at when the judge talks in the middle, she repeatedly emphasizes the fact that once the appellant got out of jail after serving seven to eight years in two prior drug offenses, he comes out three months later and he starts selling 60.6 grams of cocaine. And then on page six, right after she says the critical thing here is his criminal history, and then he got out of jail and he's hardly out and he's back into drug dealing. And then on page eight, he goes to jail for seven years, he comes out, and in three months he's back to it. Then page 13, his last sentence was seven years, and he came right out and began dealing in drugs again. And then on page 26, when she's doing her ruling, actually sentencing the defendant, she's discussing the factor of promoting respect for the law. He, quote, spent almost eight years in jail, returned to the community, and almost instantly went back into drug dealing. Page 27, discussing the 3553 factor, just punishment for the offense. We already tried seven years, eight years. That wasn't sufficient. Then 27 to 28, she's discussing deterrence. To afford adequate deterrence, seven years, eight years, didn't do that. And then she says, I'm going to give him 162 years. It has to be something beyond seven to eight years. Then Mr. Benowitz actually asks the court to reconsider her sentence. He says, and this is on pages 29 to 30, the amounts in this case were not minimal, but not, quote, not to the level that requires 162 months. And then the judge responds first. Well, the full amount here was about 100 and some odd grand. But then she goes on to say, more importantly, we have a, quote, long-running practice and pattern of drug trafficking to which jail time has made no difference. And I really can't anticipate on this record that Mr. King-Gore will do anything but return to drug trafficking when he's released. And she concludes by saying, and so I need to protect the community from further crimes. From the beginning to the middle to the end, her focus is on his repeated drug trafficking. The amounts are not minimal, but that is not the focus. And so the government contends that this court can, on this record, find that there was no reasonable probability that the debriefing statements affected his sentence. If there are no further questions, we'd submit on our briefs with respect to the other issues. Okay. Thank you, counsel. Thank you, Mr. Chairman. We'll give you a couple of minutes in rebuttal. First of all, this notion that he talked about distributing more to the person, but 20 months ensued after he was, his car was searched until he was arrested, and he had no further dealings with this person. So this is a red herring when he talked about, I can get more. But for 20 months he was out, and he did no further deals with this person. But what really, the government's speaking out of both sides of its mouth. It says there was enough evidence in the record without this statement to show he wasn't a low-level drug trafficker, and yet they went into great detail about, we know by his own admission, he had bought a quarter kilo. Then they broke it down how much it was worth. A little bit of an indication of how much money. A quarter kilo of powder is $8,500 to $9,500. And once that's cooked in a crack, which we know by his own admission he does, it can value up to $35,000. He was, and they conclude that with the defendant was a wholesaler. The district court had never mentioned the word wholesale before that. Then on page 26, which I read completely opposite of the government, where the district court said, the offense itself here is pretty serious because the quantities were large, and as the government argues legitimately, Mr. King Gore was a wholesale trafficker. That's a separate. She talks about the instant offense, and then she says, and the government argues he's a wholesale trafficker legitimately. That's the first time she mentions wholesale. The government left out on page 26. Do the guidelines use wholesale versus retail? No. They use it, I think, in determining value at one point, but that's in an application note about how to determine value. The guidelines are based on quantity, right? Yes. The guidelines are based on the quantity and amount of the drug. There are some application notes about value, how to determine certain values. Then, again, on page 28, the district court talks about how he has a drug addiction problem and says that might explain some of his drug dealing, but it doesn't go so far as to explain wholesale drug dealing. So twice the district court emphasizes this wholesale notion that had never appeared anywhere until the government emphasized it and saying it was by the defendant's own admission on page 18. Your Honor asked about how do we determine reasonable probability, and, again, I think, as you said in the dissent and Wolf, these are tests that seem to really, in the end, be no tests. But clearly the government felt it was important to take up more than an eighth, I guess, of its sentencing allocution emphasizing this material and calling it to the attention of the district court and using the particular word wholesaler in connection with this amount of drugs then echoed by the district court in sentencing this is a wholesale amount of drugs. That seems to me to actually be more than a 50%, actually, if you have to prove by a preponderance. The fact that the government went to great trouble to do this and, as the government has now admitted, did it specifically to refute the defense sentencing memorandum, which in my mind makes it worse because they're using information that was never supposed to become before the district court by the way it did, and yet they've now admitted they used it to refute the defendant's contention. I'm not sure I see how that makes it worse. Well, I think if they had just said it... Again, relying on the point that wholesale and retail are pretty slippery concepts. I think, well, I think it's bad either way. Maybe, let me put it that way, it's always bad to breach a plea agreement or a debriefing letter. Do it twice, once in a sentencing memo and once in sentencing is even worse. But to go and spend such a large portion of your allocution on it seems to me to be worse. But now we understand it was done specifically to refute contentions in the defendant's sentencing memo, not just to call this matter to the attention of the district court. But the only time the district court used the word wholesale twice was after the government went through this allocution of the improper material. They did it once at page... talked about another reason his drug addiction didn't explain the wholesale drug dealing. And the only time the government mentioned wholesale was in talking about the forbidden debriefing. And again, the part on page 26, first she talks about the offense and then she says, and as the government argues, he was a wholesale trafficker and not just a retail trafficker. So I think there's... this isn't really a close case on the reasonable probability standard. Thank you very much. Thank you, counsel. The case is submitted.
judges: Srinivasan, Williams, Randolph